No. 97,440

STATE OF KANSAS, *Appellee*, v. BRENTON S. COOK, *Appellant*.

(191 P.3d 294)

Opinion filed September 5, 2008.

*Christina M. Waugh*, of Kansas Appellate Defender Office, argued the cause and was on the brief for the appellant.

*Lee A. Davidson*, assistant attorney general, argued the cause, and *Paul J. Morrison*, attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

JOHNSON, J.: Brenton S. Cook appeals his convictions and sentences for premeditated first-degree murder, aggravated burglary, and criminal possession of a firearm. Cook argues that the evidence was insufficient to prove premeditation; that certain jury instructions should have been given; that evidence of other crimes and bad acts was erroneously admitted; and that the sentences were imposed in violation of the constitutional principles set forth in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). We affirm.

*FACTUAL OVERVIEW*

Cook does not dispute that, on February 3, 2006, he shot and killed Dean Endsley inside Endsley's Salina residence. Moreover, the various witnesses' accounts of the relevant events are not significantly inconsistent.

In January 2006, Endsley and his fiancée, Billie Bell, visited the Wichita home of Tami Salts and, while there, Endsley purchased methamphetamine. At the end of January, Salts and her boyfriend went to Endsley's Salina residence in an unsuccessful attempt to

collect monies owed on the drug transaction. Endsley told his nephew that he had resolved the debt collection confrontation by pretending that he had a gun behind his back.

Two days later, Cook had apparently assumed responsibility for the debt collection and enlisted Ron Ford to accompany him to Salina the following day. While discussing the task, Cook told Ford that he was afraid that he might have to shoot Endsley, albeit Ford believed that Cook was joking. During the night, Ford heard a gunshot and discovered that Cook had used a .38 caliber revolver to fire a bullet through the door of the pickup truck in which he was sitting.

The next morning, Cook and Ford, accompanied by Nick McQuesten and Ella Branum, traveled to Salina in the pickup. There was some suggestion that McQuesten and Ford may have believed they might share in any monies obtained, over and above the amount of the debt to Salts. Branum was simply hitching a ride to Salina and, upon arrival, was taken to her residence. Before proceeding to Endsley's residence, Cook forged a check at a grocery store to buy lunch for the group.

When the group arrived at Endsley's residence, Endsley's brother permitted them to enter the house and directed them to the bedroom where Endsley and Bell were sleeping. Cook and Ford proceeded to the bedroom door, where Cook knocked and asked Endsley to come out and discuss the money he owed. Endsley responded by telling Cook to go away, but Cook continued to knock on the door. Eventually, Endsley emerged from the bedroom, yelling for the men to leave the house. Ford testified that Endsley pushed him, but not hard. Cook pulled a gun from his coat pocket and pointed it at Endsley. Ford and McQuesten heard Endsley yell towards his bedroom to get his gun and call the cops. Bell heard a man say, "This is from Tami in Wichita." Cook fired three rounds, hitting Endsley with two and causing his death. The group immediately ran from the house and drove away.

En route back to Wichita, the group emptied the rounds from the weapon, wiped them clean, and threw them out the window. Upon arriving at Salts' house, the men took off their clothes and put them in a large plastic trash bag.

Three days later, the Wichita police recovered a pickup truck that had been stolen the previous month and returned it to the owner, Charles Galloway. The truck was heavily damaged, including a bullet hole in the door. Galloway found a checkbook in the pickup, which contained a note describing the directions to Endsley's home and which was later tied to the check that Cook forged at the Salina grocery store. Eventually, the police further investigated the pickup and discovered Cook's DNA in the vehicle.

On February 9, 2006, law enforcement arrested Cook, Ford, and McQuesten. The latter two pled to lesser charges and testified at Cook's trial, at which the jury found Cook guilty of premeditated first-degree murder, aggravated burglary, and criminal possession of a firearm. The burglary charge alleged aggravated assault as the underlying felony. Cook's two motions for a new trial and a motion for judgment of acquittal were denied. After receiving a controlling sentence of life, plus 60 months, Cook appeals directly to this court. See K.S.A. 22-3601(b)(1).

## SUFFICIENCY OF THE EVIDENCE

First, Cook challenges the sufficiency of the State's proof of premeditation, the defining element of premeditated first-degree murder in K.S.A. 21-3401(a). Our standard of review is well established.

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. [Citation omitted.]" *State v. Pham*, 281 Kan. 1227, 1252, 136 P.3d 919 (2006).

Here, consistent with our prior cases, such as *State v. Morton*, 283 Kan. 464, 474, 153 P.3d 532 (2007), the district court provided the jury with the following instruction:

"Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than an instantaneous, intentional act of taking another's life."

Both Cook and the State point to the factors which our prior decisions have listed as giving rise to an inference of premeditation:

"(1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. *State v. Scott*, 271 Kan. 103, 109, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001)." *Morton*, 283 Kan. at 475.

See *State v. Meeks*, 277 Kan. 609, 622, 88 P.3d 789 (2004), *overruled on other grounds State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2007). However, we will refrain from falling into the common trap of toting up the number of factors present to declare a winner. That should not be the calculus. In some cases, one factor, standing alone, may be compelling evidence of premeditation. Further, we will resist the temptation to weigh the evidence or assess its credibility. See *State v. Henderson*, 284 Kan. 267, 297-98, 160 P.3d 776 (2007).

Obviously, Cook thought about shooting Endsley the night before the killing because he told Ford that he was afraid he was going to have to do so. Cook discounts this evidence based on Ford's trial testimony that he thought Cook was joking. However, the question was not Ford's subjective belief as to the seriousness of Cook's statement, but rather what that statement said about Cook's state of mind. After having made that statement, Cook put a gun in the pickup glove box for the trip to Salina and then retrieved the gun to put in his coat pocket before entering Endsley's house. An objective jury could assess that evidence as establishing a prior intent to shoot the debtor, either as a necessary means of collecting the debt and/or robbing the victim or as retribution for having cheated Salts.

Cook attempts to discount the fact that he brought a handgun to Endsley's house by pointing to the manner in which aggravated burglary was charged. The State alleged that Cook committed that offense when he unlawfully remained in the residence with the intent to commit an aggravated assault, *i.e.*, with the intent to scare Endsley with the weapon. Cook argues that there was insufficient time between Endsley's demand for Cook to leave the house, *i.e.*, when Cook's presence became unlawful, and the shooting so as to allow for a premeditated transformation of Cook's intent from an intent to scare to an intent to kill. Therefore, based on the State's

theory with regard to the aggravated burglary count, Cook contends that the killing was instantaneous, rather than premeditated. Cook suggests the State should have alleged premeditated murder as the underlying felony for the aggravated burglary charge.

To keep our eye on the ball, the issue before us is the sufficiency of the evidence to support the premeditation element of first-degree murder. We are not concerned with the State's arguments on the aggravated burglary count or with what a conviction on that charge might tell us about the jury's thinking. See *State v. Beach*, 275 Kan. 603, Syl. ¶ 4, 67 P.3d 121 (2003) (convictions will not be reversed on grounds of inconsistency). The jury was to consider each charged crime as a separate and distinct offense without being influenced by any other charge. See PIK Crim. 3d 68.07. Moreover, the prosecutor's arguments are not evidence and do not determine the issue before us. That issue is whether the testimony of the witnesses and the physical evidence contained in the record would support the elements of the premeditated first-degree murder as set forth in the district court's instructions to the jury.

Nevertheless, the convictions for aggravated burglary based upon an aggravated assault and premeditated first-degree murder are not necessarily inconsistent under the facts of this case. The jury might well have determined that Cook's plan was to get whatever money was available in Endsley's residence, one way or another, that is, to use the weapon to scare Endsley into handing over money or, if that failed, then to shoot Endsley and take the money. In that scenario, the transformation from the intent to scare to the intent to kill was a matter thought over beforehand, so as to avoid the "instantaneous killing" label.

Nevertheless, the most compelling evidence of premeditation was Bell's testimony that she heard a man say, "This is from Tami in Wichita," before the shots were fired. Such a statement obviously manifests a premeditated intent to kill. Granted, not all of the witnesses testified to having heard that statement being made, and Bell did not relate that statement when she was first interviewed by police. However, without weighing the evidence or assessing witness credibility and viewing the evidence in the light

most favorable to the State, that evidence alone would support a jury finding of premeditation.

## FAILURE TO GIVE JURY INSTRUCTIONS

In separate issues, Cook asserts that the district court erred in failing to give instructions on: (1) self-defense; (2) voluntary manslaughter based upon an imperfect self-defense theory; and (3) unanimity as to the alternative means of committing aggravated burglary. Cook concedes that he did not request any of these instructions. K.S.A. 22-3414(3) provides:

"No party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects thereto before the jury retires to consider its verdict stating distinctly the matter to which the party objects and the grounds of the objection unless the instruction or the failure to give an instruction is clearly erroneous. Opportunity shall be given to make the objections out of the hearing of the jury."

However, Cook makes the creative argument that the State's inclusion of a proposed self-defense instruction and proposed imperfect self-defense voluntary manslaughter instruction in its originally submitted instructions somehow satisfies the defendant's obligation to object to the proposed instructions prior to their submission to the jury. We disagree. If a defendant wants to embrace or adopt any of the instructions proposed by the State, the defendant must take affirmative action to request that the district court give the desired instruction on behalf of the defendant or must object to the omission of the desired instruction from the court's final instructions to the jury. Cook did neither. Therefore, all three of Cook's instruction complaints are reviewed under the clearly erroneous standard of review, whereby we must be firmly convinced that there was a real possibility that the jury would have rendered a different verdict if the instructions had been given. See *State v. Trotter*, 280 Kan. 800, 805, 127 P.3d 972 (2006).

### Self-Defense

Even if Cook had explicitly requested a self-defense instruction, we would find no error in the district court's refusal to give it. Generally, a person is permitted to use force against another "when and to the extent it appears to such person and such person rea-

sonably believes that such force is necessary to defend such person or a third person against such other's imminent use of unlawful force." K.S.A. 21-3211(a). Specifically, a person may use deadly force in self-defense or defense of others only "if such person reasonably believes deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person." K.S.A. 21-3211(b). The self-defense determination requires both a subjective analysis and an objective analysis. See *State v. Walters*, 284 Kan. 1, 8-9, 159 P.3d 174 (2007).

Cook contends that when Endsley exited his bedroom, yelled at the intruders, pushed Ford, and called over his shoulder for someone to get his gun, Cook reasonably believed that he had to use deadly force in self-defense. He also points to Ford's testimony that, after the shooting, Cook was breathing heavily and acting like a "scared little boy," suggesting that Cook fired the weapon out of fear.

First, it is insufficient to merely show that Cook was scared. A reasonable person in Cook's situation must have perceived that deadly force was necessary to prevent imminent death or great bodily harm. When Endsley exited the bedroom, he was not armed and his only physical contact was to slightly shove Ford. There was nothing remotely life-threatening to the intruders, until Cook pulled his weapon and pointed it at Endsley. At that point, Endsley called over his shoulder to some undisclosed person to get his gun and call the cops. A rational person in that circumstance would have taken Endsley's statement as a clue to heed his repeated requests to leave the premises, rather than an indication that death was imminent. The fact that Endsley's request to retrieve his weapon was coupled with a directive to call the cops would indicate to a reasonable person that Endsley did not have murder on his mind. One does not normally call law enforcement to the scene where one intends to commit a homicide.

Moreover, Cook refused to leave the premises upon Endsley's demand, but rather he continued to knock on the bedroom door and demand money while armed with a handgun to assist with a debt collection. Cook was allegedly an aggressor who was committing the forcible felony of aggravated burglary. See K.S.A. 21-

3214(1) (aggressor committing a forcible felony prohibited from using the justification of self-defense). Likewise, Endsley was in a position to lawfully defend his own dwelling. See K.S.A. 21-3212. And, if further support is needed to totally dispel Cook's self-defense theory, one could find that Cook provoked such show of force as Endsley may have displayed, and, therefore, under K.S.A. 21-3214(3), Cook cannot use the justification of self-defense unless:

"(a) He has reasonable ground to believe that he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the assailant; or

"(b) In good faith, he withdraws from physical contact with the assailant and indicates clearly to the assailant that he desires to withdraw and terminate the use of force, but the assailant continues or resumes the use of force." K.S.A. 21-3214(3).

Here, Cook made no attempt to escape or to withdraw from contact with Endsley.

In short, on many levels, both factual and legal, Cook's theory of self-defense is clearly without merit, and the district court's failure to give a self-defense instruction was not erroneous in any respect.

*Imperfect Self-Defense Voluntary Manslaughter*

The district court gave the following lesser included offense instructions to the jury:

"If you do not agree that the defendant is guilty of murder in the first degree, you should then consider the lesser included offense of murder in the second degree.

"To establish this charge, each of the following claims must be proved:

"First, that the defendant intentionally killed Dean Endsley; and

"Second, that this act occurred on or about the 3rd day of February, 2006, in Saline County, Kansas.

"In determining whether the defendant is guilty of murder in the second degree, you should also consider the lesser offense of voluntary manslaughter. Voluntary manslaughter is an intentional killing done upon a sudden quarrel or in the heat of passion.

"If you decide that the defendant intentionally killed Dean Endsley, but that it was done upon a sudden quarrel or in the heat of passion, the defendant may be convicted of voluntary manslaughter only."

Cook complains that the district court should have given a lesser included offense instruction for voluntary manslaughter under the alternative means of K.S.A. 21-3403(b), which is the intentional killing of a human being "upon an unreasonable but honest belief that circumstances existed that justified deadly force under K.S.A. 21-3211, 21-3212 or 21-3213 and amendments thereto." We have some precedent declaring " 'that when a defendant has been charged with and convicted of murder in the first degree, the correctness of instructions relating to manslaughter becomes immaterial.' " *State v. Horn*, 278 Kan. 24, 43, 91 P.3d 517 (2004) (quoting *State v. Metcalf*, 203 Kan. 63, 67, 452 P.2d 842 [1969]).

Nevertheless, as indicated above, the evidence to establish that Cook had an honest belief that deadly force was justified is suspect. We are firmly convinced that the giving of an imperfect self-defense instruction would have had absolutely no effect on the jury's verdict and, therefore, its absence was not clearly erroneous.

*Unanimity*

Inexplicably, the district court gave an instruction for aggravated burglary that included the elements: "1. That the defendant knowingly *entered into or remained in* a home; 2. That the defendant did so without authority." (Emphasis added.) Where the jury is instructed that the single offense of aggravated burglary may be committed by either the unauthorized "entering into" or "remaining within" a structure, an alternative means case has been presented. *State v. Smith*, 36 Kan. App. 2d 606, 615, 142 P.3d 739, *rev. denied* 282 Kan. 795 (2006).

Citing to *Beach*, 275 Kan. 603, Syl. ¶ 6, Cook acknowledges that in an alternative means case, the jury must be unanimous as to guilt for the single crime charged but need not be unanimous as to the means by which that single crime was committed. Accordingly, a unanimity instruction is not required in alternative means cases.

However, Cook points to the further language in some cases which requires that there be substantial evidence to support each alternative means which has been charged. See *State v. Timley*, 255 Kan. 286, 289, 875 P.2d 242 (1994). But *cf. State v. Dixon*,

279 Kan. 563, 606, 112 P.3d 883 (2005) (when strong evidence supports at least one theory and no evidence supports another alternative theory, the erroneous jury instructions are harmless). The State concedes that Cook had permission to enter the Endsley residence or at least that there was no evidence presented to support a theory that Cook entered into the residence without authority. Therefore, Cook argues that a possibility exists that one or more jurors may have erroneously found guilt based upon the "entering into" theory which was unsupported by any evidence.

To reiterate, we are employing a clearly erroneous standard of review, the touchstone of which is a firm belief that a real possibility exists that the jury would have rendered a different verdict if the instruction error had not occurred. The record reveals that the State relied exclusively on the "remained in" means. The prosecutor's arguments to the jury clearly established that the State's theory was that Cook's presence in the Endsley residence became unauthorized when the victim told him to go away.

Furthermore, all of the testimony indicated that Endsley had unequivocally demanded that Cook leave the premises. The question of Cook's authority to be within the dwelling at the time of the shooting was not a focal point of the trial, nor could it be characterized as a disputed fact. Therefore, we are firmly convinced that if the jury had been instructed that it had to be unanimous as to the alternative means, as Cook argues should have happened, or if the instructions had omitted the "entering into" language, which is what should have occurred, the jury's verdict would have been exactly the same. Accordingly, any error was not clear error, and reversal is not required.

## EVIDENCE OF OTHER CRIMES

In two separate issues, Cook complains about the introduction of evidence of uncharged crimes and other bad acts. He specifically challenges evidence that (1) the pickup truck the group used was a stolen vehicle; (2) Cook forged a check at a Salina grocery prior to the shooting; (3) Cook and the others used methamphetamine after the incident; and (4) Cook threatened Ford and McQuesten with harm, after Ford had testified at Cook's preliminary hearing.

Cook attempts to characterize his challenge as a constitutional question. However, the issues presented are simply evidentiary matters to be resolved by statutory interpretation, including the analysis of K.S.A. 60-455 set forth in *State v. Gunby*, 282 Kan. 39, 56, 144 P.3d 647 (2006).

*Stolen pickup*

Various witnesses, including the owner of the pickup truck, testified that the vehicle had been stolen prior to the day that Cook drove it to Salina to collect the drug debt from Endsley. Cook concedes that defense counsel did not object to the admission of the evidence at trial. Ordinarily, that failure to object would preclude our setting aside the verdict or reversing the judgment "by reason of the erroneous admission of evidence." See K.S.A. 60-404.

However, Cook points out that he raised the issue in his second motion for new trial and states that the issue may, therefore, be reviewed. Pointedly, Cook cites to no authority for his suggestion that raising an objection in a discretionary posttrial motion can fulfill the requirement of a contemporaneous objection at trial. Such a substitution is not indicated by the language of K.S.A. 60-404, which requires the record to reflect that the objection to the evidence was "timely interposed." That statute would apply to the district court's consideration of a new trial motion, just as it applies to our appellate review, so that pointing to the content of the second motion for new trial adds nothing to our analysis.

Moreover, the rationale behind the requirement is not fulfilled when the objection is first raised after the trial has been completed. "The importance of the contemporaneous objection rule is that it gives the trial court the opportunity to conduct the trial without the use of tainted evidence." *State v. Mathis*, 281 Kan. 99, 107, 130 P.3d 14 (2006). Cook's complaint puts that rationale in sharp focus. The testimony about the pickup truck and its contents was highly relevant evidence which formed an indispensable part of the State's case. Assuming, without deciding, that the additional fact that the pickup was a stolen vehicle was irrelevant, the time to

object was when the district court could have taken measures to avoid the error.

Granted, "[w]e have recognized three exceptions to the rule precluding review when there is a failure to properly raise the issue at trial." *State v. Hunt*, 275 Kan. 811, 813, 69 P.3d 571 (2003). However, Cook does not argue for the application of an exception, and we do not perceive this to be an exceptional circumstance case. Therefore, we decline to review whether the district court erroneously admitted evidence that the pickup was a stolen vehicle.

Cook also argues that the district court erred in failing to give a limiting instruction on the purpose for which the jury could consider the other crimes evidence. The absence of a limiting instruction does not lead to an automatic reversal. *Gunby*, 282 Kan. at 58. Where, as here, the defendant fails to request a limiting instruction or object to its omission, we employ the clearly erroneous standard, whereby we determine whether there is a real possibility that the jury would have rendered a different verdict if the error had not occurred. *Gunby*, 282 Kan. at 58-59.

The fact that Cook shot and killed Endsley was undisputed. The only question for the jury was whether the killing was justified or was some lesser degree of murder. The taint created by the inference that Cook had a propensity to commit crime because he was driving a stolen vehicle was minimal in light of the facts presented in this case. We are firmly convinced that a limiting instruction would not have changed the outcome.

*Forged Check*

Next, Cook complains about the evidence establishing that he had forged a check at a Salina grocery store, prior to the shooting. At trial, Cook objected to the introduction of the forged check on the ground of relevance. On appeal, Cook argues that the evidence was inadmissible under K.S.A. 60-455 because it was not relevant or, in the alternative, the district court erred in failing to give a limiting instruction.

The State, citing to *State v. Engelhardt*, 280 Kan. 113, 127, 119 P.3d 1148 (2005), complains that the defendant objected at trial on one ground and is now arguing a different ground on appeal.

However, the gravamen of Cook's appellate argument is that the forged check evidence was not relevant to his murder prosecution.

In his brief, Cook concedes that the forged check evidence was relevant to place him in the Salina area at or about the time of the crime. However, he contends that he is not contesting that he was in the house when Endsley was shot, so the fact of his presence in Salina was not in issue. However, at the time the evidence was offered, the State did not know that Cook would concede to being present during the shooting. Moreover, the check is relevant for other reasons. For instance, it matched the checks in the checkbook recovered from the pickup truck, tying Cook to the evidence recovered from the vehicle. Further, the checkbook contained a map and directions to Endsley's home, tying Cook to the plan to travel to Salina and accost Endsley.

As before, the issue of the court's failure to give a limiting instruction is reviewed for clear error. Again, Cook is unable to convince us that a real possibility existed that if the jury had been told that it could use the forged check evidence for limited purposes, it would have reached a different decision.

### Drug Use

Cook complains about the testimony elicited by the State that Cook and his companions used methamphetamine, after returning to Wichita following the shooting. Again, Cook concedes that he failed to object to the drug use evidence but attempts to preserve the issue for review through his second motion for new trial. As noted, that posttrial motion did not satisfy the contemporaneous objection rule, and we decline to review the issue.

### Threats to Codefendants

Finally, Cook challenges the admission of evidence that he threatened Ford and McQuesten through letters written to Ford in jail. Cook concedes that trial counsel did not object to the introduction of the evidence and the issue was not raised in a new trial motion, *i.e.*, the issue is raised for the first time on appeal.

Cook makes a passing reference to the exceptional circumstance whereby this court will consider an issue not preserved for appeal "to serve the ends of justice or to prevent denial of a fundamental

right." See *Hunt*, 275 Kan. at 813. However, he does not explain why we are not simply dealing with an evidentiary issue, other than to raise the umbrella of a fundamental constitutional right to a fair trial over every alleged error in the proceeding. Not every trial error is of constitutional dimensions. A defendant is entitled to a fair trial, but not a perfect trial. *Cf. State v. Crum*, 286 Kan. 145, 162, 184 P.3d 222 (2008) (no cumulative error reversal where trial was fair but not perfect). In short, Cook fails to convince us that we are presented with an exception to our general rule requiring an issue to be raised in the trial court first.

Further, citing to *State v. Sperry*, 267 Kan. 287, 308, 978 P.2d 933 (1999), Cook attempts to bootstrap his evidence admissibility claim into the arena of prosecutorial misconduct jurisprudence where we have suggested that the district court has an independent duty to intervene. The analogy is misplaced. The district court should not be put in the position of interfering with or dictating the manner in which defense counsel tries the case. There are often strategic reasons, or at least perceived reasons, why counsel will refrain from objecting at trial. We need not second guess those choices when presented with an issue of evidence admissibility.

*GRID BOX SENTENCING*

Finally, Cook challenges his sentences, claiming that the district court violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution as set forth in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and as recently clarified in *Cunningham v. California*, 549 U.S. 270, 166 L. Ed. 2d 856, 127 S. Ct. 856 (2007), by imposing the high numbers in the appropriate sentencing grid boxes for his on-grid felony convictions without submitting the factors used to increase his sentence to a jury for proof beyond a reasonable doubt. We have jurisdiction to consider the constitutional issue for the first time on appeal, based upon *State v. Gould*, 271 Kan. 394, 404-05, 23 P.3d 801 (2001), and *State v. Conley*, 270 Kan. 18, 30-31, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001). We have an unlimited scope of review over the interpretation of the Kansas Sentencing Guidelines Act, K.S.A. 21-4701 *et seq.*, as a question

of law. *State v. Davis*, 275 Kan. 107, 124, 61 P.3d 701 (2003). The constitutionality of a statute also involves a question of law over which we have unlimited review. *State v. Carr*, 274 Kan. 442, 444-45, 53 P.3d 843 (2002).

K.S.A. 21-4704(e)(1) provides:

"The sentencing court has discretion to sentence at any place within the sentencing range. The sentencing judge shall select the center of the range in the usual case and reserve the upper and lower limits for aggravating and mitigating factors insufficient to warrant a departure."

Cook focuses on the use of "shall" in the second sentence. However, the first sentence could not be more explicit in granting the district court discretion to impose any of the prison terms found inside the applicable sentencing grid boxes. The existence of such unfettered discretion belies the judicial factfinding which *Cunningham* declared to be the unconstitutional culprit under California's sentencing scheme. In this State, no judicial factfinding is required to impose the aggravated numbers within the grid boxes applicable to the defendant. See *State v. Johnson*, 286 Kan. 824, Syl. ¶ 5, 190 P.3d 207 (2008) (providing a detailed analysis of this issue).

Affirmed.