NOT DESIGNATED FOR PUBLICATION

No. 116,658

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JOSHUA MITCHELL CLARY,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Crawford District Court; KURTIS I. LOY, judge. Opinion filed November 9, 2017.
Affirmed.

*Kyle M. Fleming*, of Pittsburg, for appellant.

*Michael Gayoso, Jr.*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MCANANY, P.J., STANDRIDGE, J., and WALKER, S.J.

PER CURIAM: Joshua Mitchell Clary appeals the denial of his K.S.A. 60-1507 motion alleging ineffective assistance of counsel. Finding no error requiring reversal, we affirm.

In December 2009, Clary was convicted by a jury of rape, aggravated kidnapping, and criminal threat. His convictions were affirmed on appeal by this court, and on February 19, 2013, the Kansas Supreme Court declined to review the matter. *State v. Clary*, 47 Kan. App. 2d 38, 270 P.3d 1206 (2012), *rev. denied* 296 Kan. 1131 (2013).

1

Clary filed a pro se 60-1507 motion on November 12, 2013, and an amended motion on October 7, 2014. In the motion, as amended, Clary claimed his trial counsel was ineffective for (1) failing to strike a partially deaf juror from the impaneled jury, (2) failing to subpoena numerous witnesses to trial, (3) failing to subpoena and secure text messages that would have proven Clary was innocent, and (4) failing to disclose and point out to the jury that the State could not produce blood or DNA evidence on the alleged weapon used by Clary. Clary also claimed appellate counsel was ineffective for failing to raise the issue on appeal that the trial court was slow in reappointing Clary adequate counsel.

On April 21, 2015, the trial court held an evidentiary hearing on Clary's 60-1507 motion at which Clary, his trial counsel (Geoff Clark), and his appellate counsel (Michelle Davis) testified. Afterwards, the parties filed proposed findings of facts. The court adopted the State's proposed findings of fact and found that Clary's representation did not amount to ineffective assistance of counsel. The court dismissed the K.S.A. 60-1507 motion. Clary appeals, raising only the first three issues from his K.S.A. 60-1507 motion.

*Standard of review and legal principles*

After a full evidentiary hearing on a K.S.A. 2016 Supp. 60-1507 motion, the trial court must issue findings of fact and conclusions of law concerning all issues presented. Supreme Court Rule 183(j) (2017 Kan. S. Ct. R. 222). An appellate court reviews the court's findings of fact to determine whether they are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. Appellate review of the district court's ultimate conclusions of law is de novo. *State v. Adams*, 297 Kan. 665, 669, 304 P.3d 311 (2013).

2

To be entitled to relief under K.S.A. 60-1507, the movant must establish by a preponderance of the evidence either: (1) "the judgment was rendered without jurisdiction"; (2) "the sentence imposed was not authorized by law or is otherwise open to collateral attack"; or (3) "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." K.S.A. 2016 Supp. 60-1507(b) (grounds for relief); Supreme Court Rule 183(g) (preponderance burden).

A claim alleging ineffective assistance of counsel presents mixed questions of fact and law. When the trial court conducts a full evidentiary hearing on such claims, the appellate courts determine whether the trial court's findings are supported by substantial competent evidence and determine whether the factual findings support the court's legal conclusions; the appellate courts apply a de novo standard to the trial court's conclusions of law. *Fuller v. State*, 303 Kan. 478, 485, 363 P.3d 373 (2015).

To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish (1) that the performance of defense counsel was deficient under the totality of the circumstances, and (2) prejudice, i.e., that there is a reasonable probability the jury would have reached a different result absent the deficient performance. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014) (relying on *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 [1984]).

Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence before the judge or jury. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). To establish prejudice, the defendant must show a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different, with a reasonable probability meaning a probability sufficient

3

to undermine confidence in the outcome. *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015).

If counsel has made a strategic decision after making a thorough investigation of the law and the facts relevant to the realistically available options, then counsel's decision is virtually unchallengeable. Strategic decisions made after a less than comprehensive investigation are reasonable exactly to the extent a reasonable professional judgment supports the limitations on the investigation. *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013) (citing *Strickland*, 466 U.S. at 690-91).

We note that the record on appeal does not contain the trial transcript, leaving this court with only a partial picture of the evidence that was before the jury. The burden is on the party making a claim to designate facts in the record to support that claim; without such a record, the claim of error fails. *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644-45, 294 P.3d 287 (2013). This court has only the testimony from the K.S.A. 60-1507 hearing and the facts as laid out in Clary's direct appeal.

*The partially deaf juror*

Clary contends that his trial counsel, Clark, allowed a juror with some hearing loss to remain on the jury without a device to assist the juror hear the testimony. Clary contends this fell below the standard of reasonable assistance of counsel.

At the 60-1507 motion hearing, Clary testified that during jury selection a juror told the judge he was deaf in his right ear. Clary testified that the judge told the juror that he was supposed to be given an amplifier but that amplifiers did not do any good because they echo. The juror was impaneled. Clary testified that, during the trial, the juror did not give any indication that he could not hear the testimony. The juror never stopped the trial and told the judge he needed assistance in hearing. But Clary testified that at one point

the juror looked "disinterested, like he just gave up trying to listen at all." The judge and defense counsel told the assistant county attorney to "speak up" repeatedly during the trial but they never reasked or reanswered the questions. The victim, E.H., was also told to "speak up" during the trial. Clary testified he never discussed the issue with his trial attorney. Clary admitted that he was only speculating that the juror could not hear the testimony.

Clark testified that he could not remember whether he tried to dismiss the juror for cause. From what Clark remembered, the judge was not going to dismiss the juror for cause, and Clark thought the juror was "the better of the other ones."

The trial court at the hearing on the 60-1507 motion found that the juror never complained about being unable to hear during the trial and that Clary was speculating as to whether the juror was unable to hear.

To reiterate, our ability to review this issue is greatly hampered by the absence of the trial transcript in the record. Thus we are only able to assess the validity of Clary's claims from an examination of the evidence before the court hearing the 60-1507 motion itself. Based on this limited evidence, we hold the trial court's findings were supported by substantial evidence.

With no indication that the juror in question was actually unable to hear the testimony, Clary has not met his burden to show either that his trial attorney's performance was deficient or that the juror's presence on the jury prejudiced the outcome. Mere speculation that the juror had a difficult time hearing at trial is not sufficient to show ineffective assistance of counsel.

*Counsel's failure to subpoena witnesses*

Clary next contends that he gave his trial attorney the names of key persons who witnessed some of the events in question and whose testimony was needed to challenge the victim's credibility. He contends that trial counsel's failure to subpoena these witnesses fell below the standard of reasonableness for a defense attorney. Clary argues he likely would have been acquitted had these witnesses testified.

At the 60-1507 motion hearing, Clary testified that trial counsel failed to subpoena a woman named Rita; Tyler Mattingly, a coworker; and Michelle, Mattingly's girlfriend. Clary did not remember Rita's last name. Rita and Michelle were with Clary the morning after the crimes allegedly occurred, which was when Clary and victim E.H. exchanged text messages. Clary claims Rita and Michelle could have testified to the text messages they exchanged. Mattingly could have testified that E.H. was not telling the truth when E.H. testified that Mattingly tried to warn her about what Clary was going to do.

Clary testified he told trial counsel that he wanted these witnesses called or subpoenaed. Within a month, trial counsel told Clary that he could not find Mattingly or Michelle. Mattingly and Michelle had been residing at a homeless shelter, but Clary did not know for how long.

Clary also complained that Michael Maike, who was subpoenaed, did not show up to testify. Maike was E.H.'s ex-husband or ex-boyfriend. Clary believed Maike could have testified that some of the bruises on E.H. were the result of a battery involving Maike. Clary admitted that, at trial, Clark cross-examined E.H. regarding the domestic battery involving Maike.

Defense attorney Clark testified that, from what he could recall, he did not know the full name of Mattingly and did not have an address for him. Clark was sure he had

6

asked his private investigator, Jack Kelly, to find Mattingly, but he could not recall. Clark did not think that they were able to find Mattingly or Michelle. Clark recalled going to the homeless shelter with Kelly to find certain people, but Clark was not 100% sure that his recollection was about the Clary case. Clark did recall going to Pro Cut Lawn Care, Clary and Mattingly's employer, and handing subpoenas to a couple of people there. But Clark did not think Mattingly was still working at Pro Cut by that time. Clark would have asked about Mattingly when he went to Pro Cut. Clark remembered being frustrated not only in locating Mattingly and Michelle, but in even trying to figure out who they were. Clark testified he had done everything that he could to locate the witnesses.

With regard to Rita, Clark testified that Kelly looked for her. Clark did not recall whether Kelly could not find her or whether the testimony would not have been favorable to Clary. Clark had notes from Kelly stating that he would be contacting Rita. With regard to Maike's failure to appear, Clark did not raise the issue with the court because he did not believe Maike's testimony would have been helpful to the theme of the defense, based on Kelly's investigation.

The trial court did not make independent findings based upon the testimony but simply adopted the State's proposed findings of fact as its own. Among the adopted findings as to adequacy of trial counsel were the following:  Clark hired a private investigator in an attempt to locate Mattingly and Michelle and exhausted all leads to find them; Clark was frustrated by his attempts to locate and ascertain who Mattingly and Michelle were prior to trial; Clark had notes indicating his private investigator attempted to locate Rita; Clark would have called Rita to testify if he had located her and received favorable information; Clark did locate Maike but did not call him as a witness because his testimony would not have been beneficial to Clary; and, though Maike did not testify, evidence was elicited that E.H. sustained certain injuries from a prior battery incident.

One of the disadvantages of wholesale adoption of a litigant's proposed findings by a trial court is that it oversimplifies the nuances of actual evidence in the record. Parties urging a court to make particular findings are naturally inclined to supply conclusions based upon parts of the record favorable to them, and omit or pass over less favorable portions. When trial courts rely exclusively on proposed findings, it makes our task on appeal much more difficult when, as here, the findings and the evidence have substantial inconsistencies.

This is amply demonstrated in this case by the trial court's finding that defense attorney Clark "exhausted all leads" in finding Tyler Mattingly, Rita (later identified as Rita Larkum), and Tyler's girlfriend Michelle. To say the least, this appears to be a considerable overstatement of the evidence as to the thoroughness of Clark's services for Clary.

Although Clark testified that he engaged investigator Kelly at an early stage of the case, and his billing records indicated he had sent Kelly a memorandum about the case, Clark could not locate a copy of the memo in his file. When asked about trying to find Tyler, Clark said, "I didn't—can't say for 100 percent sure but it seemed to me that we couldn't even—we didn't know his full name and we didn't have an address for him." Asked whether he had requested investigator Kelly to look for Tyler, Clark testified, "I'm sure I asked him to try to find the person but I don't recall."

As to potential witness Rita Larkum, Clark testified he was sure the investigator looked for her but was uncertain as to whether she could not be found or whether her testimony would not be favorable to Clary. On this rather basic point Clark stated, "I simply don't recall."

As noted above, Clark's memory also failed him when he was questioned about Clary's testimony that Tyler and his girlfriend Michelle were living in the local homeless

shelter. Asked whether he actually went to the shelter to check on Tyler and Michelle, Clark testified, "I don't know. I have a recollection—I've been to that homeless shelter on several different cases because witnesses seemed to be there or in the past were there. I can't remember in this case whether I did or not." Clark did recall driving with Investigator Kelly to the homeless shelter but testified that "I can't say 100 percent sure that that was this case or another case."

Clark's testimony at the hearing concerning his strategic decision not to seek enforcement of the subpoena for Maike was also less than totally clear. When asked why he did not raise Maike's failure to appear directly with the trial court, Clark responded, "Well, frankly, Mr. Maike's testimony I don't know would have been—would have been helpful to fit in with our theme of the case." Clark said he based this conclusion on Investigator Kelly's interview with Maike. In response to an inquiry as to whether he had discussed Maike's testimony directly with Clary, Clark said, "I think I did. Once again, it is five years, I don't have 100 percent recollection." Clark emphasized that he had spent a lot of time talking to Clary but ended by saying, "And so in answer to your question, I believe I did. Do I have a specific recollection of that time, I don't. It kind of blurs into we had a lot of conversation about this case and I thought we had talked a lot about all the witnesses, all the potential witnesses and what we should be doing, what our theme of this case was, and how to advance that theme and hopefully get a not guilty verdict."

Clark's ultimate conclusion was that Maike's failure to appear did not prejudice Clary's case in any way. His lack of recollection as to the specific reasons why he did not follow up on the nonappearance of Maike is counterbalanced to a great extent by Clark's contention that he was able to elicit the evidence Clary believed Maike could have provided through cross-examination of victim E.H.

The trial court's overbroad and unambiguous endorsement of Clark's conduct as defense counsel makes it more difficult for us to determine if substantial competent

9

evidence supports its conclusion. Hence it makes that determination a close call in this case. Applying the standard of *Cheatham*, 297 Kan. at 437, and since the proceedings from Clary's trial itself are unavailable in our record, we can hardly conclude that Clark made a "'thorough investigation of law and facts relevant to plausible options'" so as to render his decisions "'virtually unchallengeable.'" On the other hand, even applying a less than comprehensive standard to Clark's activities on behalf of Clary, we believe there is sufficient evidence of activity by Clark to trigger our duty to strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. See *Kelly*, 298 Kan. at 970; *Cheatham*, 297 Kan. at 437.

But even if we were to conclude from the limited record before us that Clark's representation of Clary was lacking, the second prong of the test under *Sola-Morales* and *Strickland* requires Clary to demonstrate that there is a reasonable probability the jury would have reached a different result absent the deficient performance. Once again, we are handicapped in fully assessing this claim by the absence of the trial record. But from our examining of the facts as set out in the published opinion of Clary's direct appeal, it appears the case against Clary was strong and the jury's guilty verdicts were well supported. Clary has failed to convince us that the outcome would be different if Clark had somehow been able to produce the three witnesses. Thus, we are unable to conclude that any deficiencies by Clark resulted in prejudice to Clary.

*The text messages*

Clary contends that his trial attorney failed to obtain certain text messages that would have exonerated him. He argues the text messages showed that the alleged victim fabricated her story to frame him.

At the 60-1507 motion hearing, Clary testified there were text messages on Mattingly's phone from E.H. the morning after the crimes allegedly occurred. E.H. had

10

been sending text messages to Mattingly that morning telling him "about what happened." Clary explained that what happened was that he and E.H. had split up. Clary took Mattingly's phone. Clary sent a text message to E.H. explaining that "while I still love you, I can't be with you." E.H. then called him "every name in the book." E.H. sent a text message to Clary that said: "I'm going to fuck you over some how, some way." Clary explained that he believed E.H. was referring to the allegations she made against him. He believed if the jurors had seen the text messages, they would have exonerated him.

Clary testified he told Detective John Austin about the text messages the night he was arrested. But the detective did not follow up except to ask E.H. about the text messages. E.H. said the text messages had nothing to do with the case. Clary testified that he asked Clark, his trial attorney, to subpoena the text messages. Clary testified that Clark later told him that Clark tried to get the text messages but that "they told him that the guy that does the text messages does not work there anymore" and that it was Clark's understanding that "they never hold on to any text messages for any amount of time." Clary admitted that Clark cross-examined E.H. regarding the text messages and pointed out numerous inconsistencies in E.H.'s testimony.

Clark testified that it was his understanding that phone companies do not store text messages longer than four days. His knowledge was a result of his membership to the national and Kansas associations of criminal defense lawyers and being on their listserv. Clark did not subpoena the phone provider. Clark also did not subpoena E.H.'s cell phone to get the text messages because he believed she would have deleted them if they helped the defense. Clark did issue business records subpoenas to T-Mobile and AT&T. He could not remember but thought the subpoenas were for E.H.'s and her mom's phone records. He recalled using the records at trial.

11

The trial court found: Clark, upon reaching out to the national association of criminal defense lawyers on a listserv, determined that the content of the text messages would not have been available from the cell phone providers because of the time lapse between when the messages were sent and when he was appointed to represent Clark; Clark did subpoena and review T-Mobile and AT&T phone records as they related to the case; Clark was able to cross-examine E.H. about the text messages; and Clark was able to point out many inconsistencies in E.H.'s version of events and discredit her testimony during the trial.

The trial court's findings are supported by substantial competent evidence. Clary has not shown that Clark's performance was deficient. Clark did research whether he would have been able to get the text messages from the phone provider but determined he would not be able to get them. Clark cross-examined E.H. about the text messages and pointed out inconsistencies in her testimony.

Moreover, Clary has not shown prejudice. Again, it is not possible for us to assess whether the text messages, assuming they existed, would have changed the outcome. We have not had the opportunity to read Clary's cross-examination of E.H. or assess the other evidence of Clary's guilt presented at trial. The facts laid out in Clary's direct appeal paint an overwhelming picture of Clary's guilt. E.H.'s testimony at trial was corroborated by her neighbor who testified that she could hear screams from E.H.'s apartment and heard Clary tell E.H. that he was "'going to kill her.'" *Clary*, 47 Kan. App. 2d at 39-40. Given the facts as we understand them, we cannot say that admission of the text messages would have affected the outcome of Clary's trial.

Affirmed.

12